**Mary Wilson MURPHY, Plaintiff–Appellee,**

v.

**Edward J. DERWINSKI, Secretary of Veterans Affairs, Defendant–Appellant.**

**Nos. 91–1393, 91–1402.**

United States Court of Appeals, Tenth Circuit.

April 1, 1993.

---

Stuart M. Gerson, Asst. Atty. Gen., Washington, DC, Michael J. Norton, U.S. Atty., Denver, CO, Robert S. Greenspan, John C. Hoyle, Washington, DC, for defendant-appellant.

Daniel F. Lynch, of Waltz, D'Antuono, Correll & Anderson, Denver, CO, for plaintiff-appellee.

Before LOGAN, Circuit Judge, LAY, Senior Circuit Judge,[1] and BARRETT, Senior Circuit Judge.

1. Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

**542**

LAY, Senior Circuit Judge.

The Secretary of Veterans Affairs appeals the district court's [2] grant of a summary judgment in favor of a plaintiff claiming discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* The plaintiff, Mary Murphy, applied to become a Roman Catholic chaplain at hospitals operated by the United States Veterans Administration (VA). The VA rejected Murphy's application on the ground that its guidelines require that she be an *ordained* member of the clergy. The district court granted summary judgment in favor of Murphy, determining that the VA's hiring interests could be equally served by relying on the agency's requirement that applicants have ecclesiastical endorsement from their churches, 776 F.Supp. 1466. We affirm.

## I.

In 1988, Murphy applied for employment as a Roman Catholic chaplain in the VA Medical Center in Denver, Colorado, where she had worked as a volunteer.[3] At that time, the VA Medical Center employed six staff chaplains—three Protestants, two Roman Catholics and one Jew. All were men.[4]

On September 15, 1988, the VA formally rejected Murphy's application.[5] Herbert B. Cleveland, director of the chaplain service, wrote Murphy that her "qualifications do not meet the Veterans Administration's requirements for a chaplain. Chaplains in the Veterans Administration must be ordained and an ecclesiastical endorsement must be included with the Standard Form 171, Application for Federal Employment." [6]

Murphy then brought an EEO complaint over the VA's refusal to consider her application. The EEO investigator proposed that the VA had not discriminated against Murphy, but an Administrative Law Judge (ALJ), after a hearing, determined that the ordination requirement is discriminatory.[7] The Deputy Secretary of Veterans Affairs disagreed, concluding that Murphy had not established that there are reasonable, nondiscriminatory alternatives for selecting a chaplain. Murphy then sued in the United

2. The Honorable Alfred A. Arraj, United States District Judge for the United States District Court for the District of Colorado.

3. Murphy received a masters of arts degree in 1986 from the St. Thomas Theological Seminary in Denver, Colorado. A widow who lost two husbands in the service of their country, Murphy, at the time of the lawsuit, was working on a Doctor of Ministry degree. Her dissertation concerns the role of the war widow/widower.

4. Of the 898 VA chaplains employed nationwide as of September 30, 1987, 881 were male and 17 were female. As of September 30, 1988, the number of female chaplains increased by four—to 21.

5. Murphy also sought ecclesiastical endorsement from the Archdiocese for the Military Services, the Roman Catholic endorsing body, but it refused to endorse her because, it said, "we endorse .only priests as Chaplains" in the VA system. Letter from Francis X. Roque, D.D., Auxiliary Bishop of the Archdiocese for the Military Services, to Mary Murphy (July 6, 1988). In response to a post-rejection query from Murphy, the Archdiocese stated "the Catholic Church ... has an unbroken tradition based on theological reasons of ordaining only men for the priesthood." Letter from Roque to Murphy (July 19, 1988).

6. Although the VA in this case has stated that it has never waived its requirements that applicants be ordained and receive ecclesiastical support from their churches, we observe that it has not always strictly adhered to all of its written guidelines for hiring. In *Baz v. Walters,* 782 F.2d 701, 703 (7th Cir.1986), the Seventh Circuit stated that the VA hired the plaintiff in that case despite his lack of three years of post-graduate parish ministry experience, one of the requirements for the job.

7. The ALJ concluded:
   Since the agency has the same ordination requirements as the Catholic Church, the agency is effectively prohibiting women from applying and being considered for Catholic chaplain positions. The evidence on its face conspicuously demonstrates that the agency's job requirement of ordination has a discriminatory impact on women.
   In light of the foregoing, this administrative judge concludes that the complainant has demonstrated pretext by showing that other nondiscriminatory selection criteria would serve the agency's purpose as well. The agency can modify its requirement by requiring only ecclesiastical endorsement as a condition

States District Court for the District of Colorado. Treating the parties' briefs as cross motions for summary judgment, the trial judge concluded that the ordination requirement violates Title VII. He emphasized that the VA has a separate requirement that applicants receive ecclesiastical endorsement from their churches. The trial judge stated:

> [B]y removing the ordination requirement and requiring only ecclesiastical endorsement, the VA can ensure that its patients receive the religious services that the Catholic church deems sufficient. The VA must rely on the church to determine the appropriate requirements for endorsement; once the church endorses a candidate and assures the VA that an applicant is in good standing, the VA need go no further. In this fashion, the VA can hire chaplains without discriminating against women on the basis of sex and accommodate the religious needs of its patients.

## II.

■ The VA contests Murphy's standing to sue.[8] Article Three of the United States Constitution requires plaintiffs to have a personal injury that is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The VA asserts that the relief Murphy seeks—abolishing the ordination requirement—will not redress her injury since she still might not be considered for a VA chaplain position. We disagree.

As the Supreme Court has said, the concept of standing is "concededly not suscep-

tible of precise definition." *Id.* "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* at 750–51, 104 S.Ct. at 3324. To avoid advisory opinions, the "relief from the injury must be 'likely' to follow from a favorable decision." *Id.* at 751, 104 S.Ct. at 3324.

Although abolishing the ordination requirement may not result in Murphy becoming employed as a VA chaplain, the essence of her sought-after relief is the removal of an allegedly illegal, gender-based barrier that precludes the VA from considering her application. In *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), the Supreme Court determined that Alan Bakke, a white applicant to medical school, had standing to challenge the University of California at Davis Medical School's practice of setting aside slots for minority applicants. *Id.* at 280 n. 14, 98 S.Ct. at 2743 n. 14. The Court approved the trial judge's determination that the University injured Bakke by preventing him from competing for the set-aside slots. *Id.* It concluded "[t]he question of Bakke's admission *vel non* is merely one of relief." *Id.* Thus, the Court held that it did not matter, for purposes of standing, whether Bakke's admission hinged solely on removal of the school's minority recruitment program.[9] Similarly, Murphy seeks merely to remove a sex-based barrier precluding consideration of her application. Whether she ultimately obtains the position is irrelevant for standing purposes because her alleged injury stems from the VA's use of gender-based criteria to reject her application—not its failure to hire her.[10] Such an injury

of employment and removing the ordination requirement.

**8.** The VA raises the standing issue only in its reply brief. Although in other cases we have declined to address issues raised first in a reply brief, *see, e.g., Boone v. Carlsbad Bancorporation, Inc.,* 972 F.2d 1545, 1554 n. 6 (10th Cir. 1992), we do so here to remove any uncertainty over this jurisdictional requirement.

**9.** The University of California had stipulated that it could not prove it would have rejected Bakke's application were it not for its minority recruitment program. 438 U.S. at 280, 98 S.Ct.

at 2742–43. The Court said, however, that "even if Bakke has been unable to prove that he would have been admitted in the absence of the special program, *it would not follow that he lacked standing.*" *Id.* at 280 n. 14, 98 S.Ct. at 2743 n. 14.

**10.** The VA suggests that removal of the ordination requirement will not help Murphy compete for a chaplain position because the Archdiocese for the Military Services will still refuse her ecclesiastical endorsement. In so arguing, the VA is engaging in speculation which we need not join. Of course, if it turns out that the

goes to the heart of Title VII. As the Supreme Court explained in *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971):

> In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of minority group.... What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.

### III.

We now turn to the merits. We review a district court's decisions on summary judgment *de novo*. *Hydro Conduit Corp. v. American–First Title & Trust Co.*, 808 F.2d 712, 714 (10th Cir.1986). We thus apply the same standard as the trial court: whether the record, when viewed in the light most favorable to the non-moving party, shows no genuine issue of material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ Murphy claims that the VA requirement has a disparate impact on women. Her claim does not require a finding of intentional discrimination because "the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988). The thrust of the inquiry is whether the employer's practice creates "artificial, arbitrary, and unnecessary barriers to employment." *Griggs*, 401 U.S. at 430–31, 91 S.Ct. at 853; *see, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975).

■ Under the disparate impact theory, a plaintiff must first make out a prima facie case of discrimination by showing that "a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir.1991). The burden then shifts to the defendant to rebut with evidence of a "business justification" for its action. *Id.* at 1243. If the defendant meets this burden of production, then it falls to the plaintiff to show that the justification is a pretext for discrimination. *Id.* at 1244. We explained in *Ortega* that

> plaintiffs may still prevail if they can "persuade the factfinder that 'other tests or selection devices, without a similarly undesirable [discriminatory] effect, would also serve the employer's legitimate [hiring] interest[s].' " Further, those alternative practices "must be equally effective ... in achieving [the employer's] legitimate employment goals." This may be a difficult burden for plaintiffs to meet, however: "the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative selection or hiring practice in response to a Title VII suit."

*Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 660–61, 109 S.Ct. 2115, 2126–27, 104 L.Ed.2d 733 (1989)).[11]

The trial court determined that the plaintiff made out a prima facie case of discrimination and that the defendant articulated a

---

ecclesiastical endorsement requirement serves as pretext for sexual discrimination, Murphy or another aggrieved plaintiff may claim that the requirement violates Title VII's prohibition on discrimination.

**11.** Both parties have briefed the issue of whether this court should retroactively apply the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991), to alter the standards announced in *Wards Cove, supra.* Because we determine that the outcome is the same under both standards, we decline to address the statute's retroactivity. The issue of retroactivity is now before the Supreme Court. *See Harvis v. Roadway Express, Inc.*, 973 F.2d 490 (6th Cir.1992), *cert. granted sub nom. Rivers v. Roadway Express, Inc.*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993); *Landgraf v. USI Film Prods.*, 968 F.2d 427 (5th Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993).

legitimate business justification for its practice. The parties have not disputed these conclusions. The focus on appeal is whether the VA's business justification for requiring an ordained clergy person constitutes a pretext for gender discrimination. This in turn depends on whether the ecclesiastical endorsement alone will ensure religious assistance to patients in the VA hospital system without having a similar disparate impact on women. *Wards Cove*, 490 U.S. at 660–61, 109 S.Ct. at 2126–27.

The VA argues that it will be unable to provide equally effective religious services to patients if all chaplains cannot perform the full range of religious functions established by their faiths. It notes that hospital chaplains may be on duty alone or may be called in the middle of the night. In the Roman Catholic religion, only priests may perform the celebration of the Eucharist (the Liturgy of the Mass), the Sacrament of Penance (confession), and the Sacrament of the Sick (originally called Last Rites). Since the endorsing body might not require applicants to be priests, the VA argues that it may wind up with chaplains who cannot provide patients with a full spectrum of religious services.

The district court held, and we agree, that the endorsement requirement provides ample safeguard that VA chaplains will be sufficiently trained to provide patients with those religious services the church, not the VA, finds necessary. *See also Turner v.*

*Parsons*, 620 F.Supp. 138 (E.D.Pa.1985) (holding that the endorsing requirement does not violate the Establishment Clause), *aff'd*, 787 F.2d 584 (3d Cir.), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2280, 90 L.Ed.2d 722 (1986). The VA's ecclesiastical endorsement requirement asks churches for a recommendation that "in the judgment of the endorsing body, [the endorsee is] qualified to represent said religious community in this specialized ministry." VA Manual on Clinical Affairs—Chaplain Service (VA Manual), M–2 Part II, § 1.06(a)(5) (March 12, 1990). The record shows that outside the VA hospital system, women may and do serve as Roman Catholic chaplains without disruption of service.[12] This suggests that the ordination requirement is not necessary for a hospital or medical center to provide effective religious service for its patients.

The hiring of non-ordained chaplains at the VA hospital might create some reshuffling of work-place responsibilities, but nothing of the magnitude that suggests Title VII must yield. Most of a chaplain's duties would be unaffected by the removal of the ordination requirement. A VA hospital chaplain is "not simply a preacher but a secular employee hired to perform duties for which he has, by dint of his religious calling and pastoral experience, a special aptitude." *Baz v. Walters*, 782 F.2d 701, 705 (7th Cir.1986).[13]

---

12. At a portion of the administrative hearing that was made part of the district court record, the VA's director of Chaplain Services, Herbert B. Cleveland, testified that chaplains in some civilian hospitals are not ordained priests. Murphy also testified in the administrative proceedings that she is aware of two women practicing as Catholic chaplains at separate hospitals in the Denver area.

13. The VA Manual lists the following requirements for chaplain position:
    (1) Must be a citizen of the United States.
    (2) Must be an ordained clergyperson.
    (3) Must have a Bachelor of Arts or Science degree (or its equivalent) from an accredited college or university plus Bachelor of Divinity degree (or its equivalent) from an accredited theological institution. Approximately 210 semester hours or more are required for such degrees. In most cases, the current equivalent of the Bachelor of Divinity degree is now

termed a Master of Divinity, but requires the same amount of academic preparation.
    (4) Must have at least 3 years of full-time clergy experience after ordination, in which the principal duty was as a clergyperson after completion of professional preparation; and
    (5) Must have an ecclesiastical endorsement from the officially recognized national endorsing body of their religious community. The endorsement, which the applicant must furnish VA, is the written statement that the applicant's religious community certifies to the good standing as a regularly-ordained clergyperson of said religious community for the 12-month period prior to the endorsement. It also certifies that the individual so endorsed is, in the judgment of the endorsing body, qualified to represent said religious community in this specialized ministry.
VA Manual § 1.06(a).

The VA Manual states that the Chaplain Service's primary objective is to "provide for the spiritual welfare" of patients by establishing relationships with individual patients, provide patients and family members with ministry in crisis situations, counsel individuals and groups, create opportunities for religious worship, and work with veterans organizations and volunteers as needed.[14] Priests are not needed to administer these functions.[15] The VA desires that its chaplains provide "full affirmation and support ... to each individual patient" and follow an ecumenical practice that stresses blending "general or universal truths and traditions." VA Manual § 1.01. In these respects, the VA program is similar to prison chaplain services in which each chaplain's particular religious affiliation is "a matter of secondary importance." *Rasul v. District of Columbia,* 680 F.Supp. 436, 440 (D.D.C.1988); *see also Carter v. Broadlawns Medical Center,* 857 F.2d 448, 455 (8th Cir.1988) (upholding the constitutionality of a county hospital's chaplaincy program in which the chaplain does not function in a "traditional parish- or institutional-style ministry" but rather addresses "the needs of the individual patient, as defined by the patient, not the chaplain," without proselytizing to patients), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1569, 103 L.Ed.2d 935 (1989). Thus, the hiring of non-priests will not have any impact on the chaplaincy program as far as many of the chaplain's duties are concerned.[16]

The experience of the VA hospital in Denver where Murphy sought to work suggests that removal of the ordination requirement will not disrupt services only priests may perform. Of the hospital's six chaplains at the time of this lawsuit, two were Catholic priests. Thus, four of the chaplains could not provide Roman Catholics with services unique to that religion. Similarly, none of the six could administer unique religious services to members of nonrepresented faiths. When a priest is needed but, for whatever reason, is unavailable, the VA Manual calls for supplementing its full-time chaplain services through contract help or other arrangements. VA Manual § 1.05(a); *id.* § 106(h) (establishing a procedure for hiring contract chaplains on a case-by-case basis in the case of an "inability of one clergyperson to assume the total responsibility" for serving the specific religious needs of pa-

---

**14.** The VA Manual states:

The primary objective of the Chaplain Service is to provide for the spiritual welfare of the patients. Guidelines to accomplish this mission are as follows:

a. A pastoral ministry to individual patients, which will involve establishing a relationship with patients.

b. Ministry to patients and their families in crisis situations.

c. Opportunities for ordinances, sacramental/ritualistic ministries and services for inpatient groups and individual inpatients.

d. Pastoral counseling with patients, individually or in groups, and with family members when appropriate.

e. Opportunities for religious worship in an appropriate setting.

f. Working cooperatively with other disciplines in bringing about wholeness for the patients.

g. Supporting management in the development of the overall mission of the facility.

h. Providing other supportive services to aid in the total care and treatment of patients in outpatient clinics, community nursing homes, hospices, vet centers, those receiving hospital-based home care, etc.

i. Providing bereavement counseling to veteran patients and family members, whether it is through personal pastoral care/counseling means in daily ministry or through more structured programming.

j. Conducting funerals as requested and required, and as directed by the facility Director. (See par. 5.03).

k. Working with veterans organizations and volunteers to enhance the total mission of the Chaplain Service and the facility.

VA Manual § 1.03.

**15.** At least one commentator observed that when priests are unavailable, the Catholic Church has turned to women to perform pastoral care. Ruth A. Wallace, *They Call Her Pastor: A New Role for Catholic Women* 1–14 (1992) (discussing Catholic practice of assigning pastoral care to deacons and other individuals when a priest is unavailable).

**16.** In *Carter v. Broadlawns Medical Center,* for example, the hospital's single chaplain was a deacon in the United Church of Christ. She had not been ordained. 857 F.2d at 450. Like the plaintiff here, the chaplain in *Carter* had an academic background that prepared her to assist patients in their spiritual needs. She had a Masters in Divinity and was trained in grief counseling and Clinical Pastoral Education. *Id.*

tients). The VA also uses volunteer chaplains; Murphy served as a volunteer at the Denver VA hospital.

Even though the two Roman Catholic chaplains at the Denver hospital are on call during their off-duty hours, the hospital has made arrangements to supplement Roman Catholic services by calling on volunteer assistance of a nearby parish priest. Making outside arrangements are thus a normal part of operations at VA hospitals and do not materially effect the level of service the VA provides its patients. *Cf. Bob Jones Univ. v. United States,* 461 U.S. 574, 603–04, 103 S.Ct. 2017, 2034–35, 76 L.Ed.2d 157 (1983) (government's interest in eradicating racial discrimination in education need not yield to religious school's discriminatory enrollment practices). Thus, the VA argument basically lends oversight to the fact that it must be the endorsing body of a religious denomination—and not the VA—that determines the qualification of its representatives who provide religious services to VA patients.

■ The VA also warns us that elimination of the ordination requirement creates a danger of improper entanglement between church and state. It argues that the ordination requirement provides an objective criteria insulating its hiring requirements from an Establishment Clause challenge. We fail to see the danger. The VA already relies on the endorsing bodies for their advice in hiring. The VA also considers withdrawal of ecclesiastical endorsement sufficient cause for dismissal. VA Manual § 106(b). Government chaplaincy programs have been upheld in the face of Establishment Clause challenges. *See Carter v. Broadlawns Medical Center,* 857 F.2d 448 (8th Cir.1988) (county hospital), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1569, 103 L.Ed.2d 935 (1989); *Katcoff v. Marsh,* 755 F.2d 223 (2d Cir.1985) (U.S. Army). The VA in this case successfully fought off the plaintiff's Establishment Clause arguments on summary judgment in the trial court, and the district court's ruling has not been appealed to us. We fail to see

how removal of the ordination requirement, without more, will somehow transform the endorsing requirement from a presumably constitutionally satisfactory hiring prerequisite to one that is constitutionally infirm.[17]

■ Finally, the VA argues that Murphy has not proven that removal of the ordination requirement will have a smaller disparate impact on women. *See Ortega,* 943 F.2d at 1244 (stating a disparate impact plaintiff must prove her favored remedy would not have a "similarly undesirable [discriminatory] effect" on hiring). We disagree. As far as Roman Catholic applicants are concerned, the removal of the ordination barrier lifts the only restriction that the VA has established that per se prevents female applicants from consideration. Thus, with the ordination requirement gone, the VA's own policies will not prevent women from competing for Catholic chaplain positions.

For the foregoing reasons, the decision of the district court is affirmed.

**17.** We observe that, although it is not the position the VA has taken here, its General Counsel has suggested that the department's current ordination requirement "somewhat entangles the VA in" religious debates over female clergy. Opinion on Chaplain Employment Qualifications, O.G.C. Advisory Op. 85–89, at 7–8.