Ebrahim SADEGHI, Petitioner,

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 94–9502.

United States Court of Appeals, Tenth Circuit.

Nov. 22, 1994.

Woon Ki Lau, Lau & Choi, P.C., Denver, CO, for petitioner.

Frank W. Hunger, Asst. Atty. Gen., Civ. Div., Mark C. Walters, Asst. Director, Alison R. Drucker, Office of Immigration Litigation, Civ. Div., Dept. of Justice, Washington, DC, for respondent.

Before TACHA, BRORBY, Circuit Judges, and KANE,* Senior District Judge.

TACHA, Circuit Judge.

Ebrahim Sadeghi has petitioned this court to review the final deportation order and denial of application for asylum entered by the Board of Immigration Appeals (BIA).[1] We exercise jurisdiction pursuant to 8 U.S.C. § 1105a(a), and affirm.

Petitioner, an Iranian native, entered the United States as a visitor on April 8, 1988, and overstayed his visa. On June 22, 1989, he was served with an order to show cause alleging his deportability.

Petitioner conceded deportability but requested asylum and withholding of deportation. At a hearing before an Immigration Judge (IJ), petitioner presented evidence

---

* Honorable John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation.

1. After examining the briefs and administrative record, this panel has determined unanimously that oral argument would not materially assist the determination of this petition for review. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

that he has been a member of an anti-government group called the Iran Freedom Society (renamed the National Movement of the Iranian Resistance or NAMIR after the 1979 revolution) since he was a student in the 1960s. He became a high school principal in Iran in the 1970s. He discouraged his teachers from teaching the students about the Islamic religion because he did not agree with it. The government took no action against him for doing so.

In 1978 he went to France with his wife and children to further his education. He returned to Iran in August 1982 without his family. He thought the regime was not that strong and could be overthrown in a few months. He discovered that the country was being run on Islamic principles. In December 1982 he obtained a teaching job through a former student who had been appointed by the Islamic government as a high school principal. He obtained the job despite his anti-Islamic views because it was assumed he had or would change his views.

Petitioner hinted to his students about his anti-Islamic views. At some point a fourteen-year-old student, Hassan, told petitioner he was going to fight in the Iraqi war because he wanted to be a "martyr for God." Cert.Admin.R. at 61. Petitioner begged the student not to go. He believes the student reported this to authorities. In April 1983, a group of national guards with guns came to the school looking for him. They stated they were there to get him because he was against the government and the Islamic revolution. He escaped out a side door, did not return home, and through friends was able to obtain an exit permit.

Petitioner left for France in May 1983, where he remained until 1988. He did not seek asylum from France. He now thinks France is not a safe country for him because Iranians have been killed and terrorized there, although his wife and daughter continue to live there. He came to the United States in 1988 to visit his son, and was looking into applying for asylum before he was arrested. He believes that he will be arrested, tortured, or killed by the current Iranian regime if he returns to Iran.

Two witnesses claiming to be former members of the Iranian military or police, Reza Massihzadeh and Gholam Hossein Mohammadi Pank, presented evidence that petitioner's name appeared on a list of individuals wanted by the Iranian government. Massihzadeh believes that petitioner would be arrested immediately if he returned to Iran. Mohammadi testified that petitioner is wanted by the government and should not go back to Iran.

Petitioner also submitted a letter from Hassan Khaleghi, a former Iranian Air Force colonel, agreeing that petitioner's name was on a list of persons wanted by the Iranian government, and that petitioner would be arrested if he returned to Iran. He submitted an affidavit from a former student, Shahriar Zahed, verifying the April 1983 incident with the governmental agents, and stating that petitioner remains on a "wanted" list because he is considered a radical who advocates the overthrow of the current Islamic regime. Zahed has no doubt that petitioner would be subjected to persecution because of his political beliefs if he were to return to Iran. Finally, petitioner submitted a letter from NAMIR stating that all Iranians fleeing the country because of their anti-governmental activities will face imprisonment or death should they return. NAMIR further stated that the possibility of such treatment being applied to petitioner is very serious.

The Bureau of Human Rights and Humanitarian Affairs (BHRHA) submitted an advisory opinion. In its opinion, the allegations in petitioner's application, along with information about country conditions and other relevant factors available to the Department of State, failed to constitute a valid claim of persecution.

The IJ framed the decisive issue as whether petitioner's fear was a fear of prosecution for opposing his student's service in the Iraqi war, or a fear of persecution. Although the IJ found petitioner's evidence credible, and believed he had a legitimate fear of returning to Iran, the IJ did not think this fear was based on persecution due to race, religion, nationality, membership in a social group, or political opinion. He therefore denied the application for asylum and withholding of

deportation, but granted voluntary departure.

On appeal, the BIA agreed petitioner failed to prove the Iranian government's attempt to arrest him was with an intent to persecute. As an alternative basis for its decision, it parted with the IJ and found petitioner's evidence not fully credible. It therefore dismissed the appeal.

■ The granting of asylum under 8 U.S.C. § 1158(a) is a two-step process. First, the alien must prove statutory eligibility for asylum by establishing that he or she is a refugee. Second, if the alien establishes refugee status, the Attorney General then applies her discretion to grant or deny asylum. *Kapcia v. INS*, 944 F.2d 702, 706, 708 (10th Cir.1991). We are only concerned with the first step in this appeal.

■ "To establish refugee status, the alien must prove either past 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id.* at 706 (quoting 8 U.S.C. § 1101(a)(42)). The "well-founded fear of persecution" standard, with which we are concerned in this appeal, involves both a subjective "fear" component, and an objective "well-founded" component. The subjective component requires that the alien's fear be genuine. However, this component is not relevant until the alien proves the objective component. *Id.*

■ The alien has the burden of proving the objective component through credible, direct, and specific evidence of facts that would support a reasonable fear that he faces persecution. *Id.* at 707, 708. We review the Board's findings to determine whether reasonable, substantial and probative evidence supports them and may reverse only if petitioner presented evidence that compels the conclusion he has a well-founded fear of persecution based on a statutory factor. *INS v. Elias–Zacarias*, 502 U.S. 478, —— & n. 1, 112 S.Ct. 812, 815 & n. 1, 117 L.Ed.2d 38 (1992).

Petitioner challenges the finding that he had not established the objective component of the well-founded fear of persecution standard. He argues that he presented evidence

the Iranian government sought him out and placed his name on a list not for purposes of criminal prosecution but rather to persecute him because of his political and religious beliefs. He notes that not all criminal arrests are legitimate prosecutions but rather may be due to political and religious beliefs, citing *Blanco–Lopez v. INS*, 858 F.2d 531 (9th Cir.1988).

While we have no quarrel with the proposition that not all arrests are related to legitimate criminal prosecutions, the question is whether petitioner's evidence compels the conclusion that his attempted arrest and placement on the "wanted" list were for persecution because of a statutory factor. Petitioner testified that the governmental forces stated they were looking for him because he was "against [the] government and against [the] Islamic revolution and Islam." Cert.Admin.R. at 63. However, there was no evidence that petitioner's being against the government referred to anything other than his counseling a student not to fight in the Iraqi war, an act which the BIA reasonably could have inferred was illegal in Iran; or that the governmental forces were doing anything other than attempting to effect a legitimate arrest.

■ Prosecution for illegal activities "is a legitimate government act and not persecution as contemplated by the Act." *Kapcia*, 944 F.2d at 708. More specifically, "a sovereign nation enjoys the right to enforce its laws of conscription, and … penalties for evasion are not considered persecution." *M.A. v. United States INS*, 899 F.2d 304, 312 (4th Cir.1990). As petitioner had the burden of proof, he had the burden of proving that the Iranian government sought him for purposes of persecution, rather than for the legitimate purpose of criminal prosecution. His evidence does not compel the conclusion that he was sought for persecution rather than prosecution.

■ Petitioner raises the following arguments for the first time in his reply brief: that he is a member of a group targeted for persecution, thereby satisfying the test in 8 C.F.R. § 208.13(b)(2)(i); and that he was a conscientious objector to military conscrip-

tion and the Iranian government therefore did not have a legitimate basis for prosecution. However compelling these arguments may be, we generally do not consider issues raised for the first time in a reply brief, *Boone v. Carlsbad Bancorporation, Inc.,* 972 F.2d 1545, 1554 n. 6 (10th Cir.1992), except when those issues relate to jurisdictional requirements, *see Murphy v. Derwinski,* 990 F.2d 540, 543 n. 8 (10th Cir.1993). As none of these arguments go to jurisdiction, we do not consider them.

█ Petitioner also argued for the first time in his reply brief that the INS failed to follow its own precedent, *In re Soleimani,* Interim Dec. 3118 at 10–11 (Bd.Immigration App.1989), which requires that foreign law be proven by the party seeking to rely on it. However, petitioner appears to have been responding to the INS's argument that, despite a lack of evidence, the BIA was entitled to draw a reasonable inference that Iran had laws which would punish interference with its wartime efforts. Br. for Respondent at 23–24. We therefore review the contention. *See In re Wildman,* 859 F.2d 553, 555–56 n. 4 (7th Cir.1988) (holding where appellee raises argument not addressed by appellant in opening brief, appellant may respond in reply brief).

In *In re Soleimani,* the alien had carried her burden of proving refugee status in an asylum proceeding. Interim Dec. 3118 at 6. The question then was whether she had become firmly resettled in another country. The Immigration Judge had found that the alien had been offered permanent resettlement under Israel's Law of Return. *Id.* at 10. The BIA concluded, however, that there was nothing in the record, beyond the BHRHA's perfunctory reference to the existence of this law, documenting its nature and purpose or specific provisions. *Id.* "Absent any such documentation, the Board cannot find that the respondent had been offered permanent resettlement in Israel within the meaning of the firm resettlement concept." *Id.* Then, relying on *In re Annang,* 14 I & N Dec. 502 (Bd.Immigration App.1973), the BIA concluded that "[f]oreign law is a matter to be proven by the party seeking to rely on it." *In re Soleimani,* Interim Dec. 3118 at

10–11. It noted that the INS had submitted nothing of record regarding Israel's Law of Return. *Id.* at 11.

*In re Annang,* 14 I & N Dec. at 503, held that a petitioner has the burden of establishing eligibility for benefits under the immigration laws and in such proceedings, "the law of a foreign country is a question of fact which must be proved by the petitioner if he relies on it to establish eligibility for an immigration benefit." Placing the burden of proving foreign law on a petitioner is consistent with the general rule that the petitioner bears the burden of proof. However, requiring the INS to present proof of the laws it claims the Iranian government was attempting to enforce would impermissibly shift the petitioner's burden of proving a well-founded fear of persecution to the INS to disprove the claim. We refuse to apply *In re Soleimani* to require that the burden of proving Iranian law be placed on the INS.

Substantial evidence supports the Board's finding that petitioner's evidence did not establish a well-founded fear of persecution for purposes of asylum. We therefore need not address whether the Board properly questioned the credibility of petitioner's evidence, or whether he met the tougher standard for withholding of deportation, *see Nguyen v. INS,* 991 F.2d 621, 626 (10th Cir.1993).

AFFIRMED.

KANE, Senior District Judge, dissenting:

I respectfully dissent. I think the decision of the Board of Immigration Appeals (BIA) should be reversed and the cause remanded. I think the treatment to the petitioner by the BIA is conspicuously flawed and the result is utterly lacking in justice. Moreover, the BIA has violated its own precedent in *In re Soleimani,* Interim Dec. 3118 (Bd.Immigration App.1989), by requiring petitioner to prove the existence of a foreign law upon which the respondent relies but does not prove.

The Attorney General has discretion to grant asylum to an otherwise deportable alien who qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A). "[A] grant of asylum requires two steps." *Kapcia*

*v. INS,* 944 F.2d 702, 706 (10th Cir.1991). Initially the alien must establish he or she qualifies as a refugee. At this step, the asylum applicant must prove specific facts showing either "past 'persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Id.* at 706 (quoting 8 U.S.C. § 1101(a)(42)). Once the alien shows he or she qualifies for refugee status, in step two, he or she must show that circumstances warrant a favorable exercise of discretion. *Id.* at 708. In this case both the Immigration Judge (IJ) and the BIA concluded Sadeghi failed to establish refugee status and therefore did not reach whether asylum would be appropriate in the exercise of discretion.

We review the BIA's determination of refugee status under a substantial evidence standard. *INS v. Elias–Zacarias,* 502 U.S. 478, ——, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992) ("The BIA's determination that [the alien] was not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'") (quoting 8 U.S.C. § 1105a(a)(4)). *See also Castaneda v. INS,* 23 F.3d 1576, 1578 (10th Cir.1994).

My review of the record differs from that of the majority. I find the BIA's determination that Sadeghi failed to establish a well founded fear of future persecution if he returns to Iran is neither reasonable nor supported by substantial evidence. At a hearing before an IJ, Sadeghi presented evidence that he has been a member of the anti-government group initially called the Iran Freedom Society and later the National Movement of the Iranian Resistance since he was a student in the 1960s. Cert.Admin.R. at 54, 72–73, 96–99. He testified he counselled a fourteen-year-old student not to go to the Iraqi war. *Id.* at 61. Sadeghi was positive the student reported him to the authorities. *Id.* at 62. In April 1983, four armed men dressed as national guards came to the school looking for Sadeghi. *Id.* They said they were there to arrest him because he was against the government and the Islamic revolution. *Id.* at 63. Sadeghi escaped through a side door, did not return home,

obtained an exit permit and escaped to France. *Id.* at 63–70. Sadeghi further testified if he returned to Iran, he would be killed immediately for speaking against Khomeini, his government and Islam. *Id.* at 73–74. He stated he has never broken any law. *Id.* at 74.

A witness Reza Massihzadeh testified he was a former brigadier general in the intelligence division of the Iranian armed forces. *Id.* at 108–11. Massihzadeh asserted if Sadeghi returned to Iran he would be arrested immediately. *Id.* at 115. Massihzadeh and another witness, Gholam Hossein Mohammadi, testified Sadeghi's name appeared on a list of anti-government persons wanted by the Iranian authorities. *Id.* at 121–25.

Sadeghi also submitted the affidavit of Hassan Khaleghi, "former colonel of Imperial Iranian Air Force Counter Intelligence," confirming Sadeghi's name to be on a list of persons wanted by the Iranian government. *Id.* at 197. In addition, Sadeghi introduced the affidavit of Shahriar Zahed, attesting that he was a student at the school where Sadeghi taught at the time of his attempted arrest. *Id.* at 204. Zahed witnessed the four armed men "dashing into the teacher's lounge and calling Ebrahim Sadeghi's name." *Id.* He stated the four men demanded Sadeghi turn himself in as he was under arrest. *Id.* at 205. Several teachers protested the arrest and, together with some students surrounded the four men. *Id.* He confirmed Sadeghi escaped through a side door. *Id.* He also stated there was no doubt Sadeghi was on a "wanted list" and would be persecuted for his political beliefs if he returned to Iran. *Id.* Sadeghi finally submitted a letter from NAMIR (The National Movement of the Iranian Resistance), stating all Iranians fleeing the country because of their activities against the regime risk imprisonment and their lives if they return to Iran. *Id.* at 206. The letter stated further that in the case of Sadeghi, the possibilities of such treatment were very serious considering his activities in Iran and the conditions of his flight. *Id.*

The Department of State submitted a *pro forma* opinion stating that based on the allegations made in Sadeghi's application for asylum and "information about country and

other relevant factors available ... through its conduct of foreign affairs," it did not consider Sadeghi to have a well-founded fear of persecution upon his return to Iran. *Id.* at 188, 223. The opinion notes "[t]he strength of the application may be affected by your interview or hearing, or additional information subsequently presented by the applicant." *Id.* at 188.

The IJ in his decision viewed the decisive issue as "whether respondent's fear is predicated on a fear of prosecution because of the action he has taken [in opposing his fourteen-year-old student's fighting in the Iraqi war] or whether it is based on persecution." *Id.* at 31. The IJ determined Sadeghi's evidence to be credible and found he had established a fear of returning to Iran. *Id.* at 32–33. The IJ found, however, Sadeghi had failed to meet the statutory standard of establishing "a well-founded fear of persecution based on his race, religion, nationality, belonging to a particular social group, or because of political opinion" as enunciated in *Matter of Acosta,* Interim Dec. 2986 (Bd.Immigration App. 1985). *Id.* The IJ therefore denied the application for asylum and withholding of deportation. *Id.* at 34.

The BIA denied Sadeghi's appeal on two grounds. First, it agreed with the IJ that Sadeghi had failed to establish the Iranian government's attempt to arrest him was based on an intent to persecute him rather than to prosecute him for suspected illegal activity. *Id.* at 5–6. As an alternative ground the BIA found weaknesses in the testimony of Sadeghi and his two witnesses and concluded Sadeghi had not presented persuasive evidence to establish either a well-founded fear of prosecution or a clear possibility of persecution in returning to Iran. *Id.* at 6.

In reaching its conclusion that Sadeghi had failed to prove that his attempted arrest was based on the Iranian government's intent to

persecute him rather than prosecute him for the illegal activity of counselling a fourteen-year-old student not to go to war, the BIA made a number of assumptions. First, the BIA assumed Iran has a conscription law mandating that a fourteen-year-old serve in the Iranian army. The second assumption is that Iran has a law which makes it a criminal offense to counsel a fourteen-year-old not to serve in the army. The third assumption is that we recognize every law, even one that forces children to act as mine sweepers[2] or one that punishes a person who counsels a child to refrain from doing so. There has been no evidence produced in support of any of these assumptions.

The majority opinion states: "However, there was no evidence that petitioner's being against the government referred to anything other than his counselling a student not to fight in the Iraqi war, an act which the BIA reasonably could have inferred was illegal in Iran; or that the governmental forces were doing anything other than attempting to effect a legitimate arrest." I don't think there is any basis at all, reasonable or otherwise, upon which that inference could be made or that could justify the presuppositionless conclusion that Iran's governmental forces attempt to limit arrests to the bounds of legitimacy. Such statements at best are aspirational, not rational. Indeed, if any inference is to be made, it should be based on known facts. It is known that Iran has ratified the Convention on the Rights of the Child which prohibits nations from permitting or requiring children to participate in fighting wars.[3] Thus, the only rational inference is that petitioner's activity was legal and an attempt to arrest him for legal activity is *ipso facto* illegitimate.

Sadeghi's testimony indicates, contrary to the BIA's assumption, that the children's departure for war was voluntary. "One day there was a kid named Hassan (phonetic sp.), about 14 years old, this high. He wanted ...

---

**2.** As the Immigration Judge noted:

[Sadeghi] relates an instance in which one of his students stated that he was going to the front to be a martyr of God. It was, apparently, during the period of time when the Iranian authorities were using their people, particularly the younger citizens, to clear the mine fields with

their bodies and sacrificing themselves. Cert. Admin.R. at 26.

**3.** Iran ratified the Convention on the Rights of the Child on July 14, 1994. *U.N. Committee on the Rights of the Child Report* (Aug. 12, 1994). See text *infra.*

he was going to go to war and I asked him where are you going and he told me that I want to go and be martyr for God." Cert.Admin.R. at 61. If the Immigration and Naturalization Service (INS) wanted to rely on an Iranian law which required fourteen-year-old boys to serve in the army, it had the burden to prove such law. *See In re Soleimani*, Interim Dec. 3118 at 10–11 (Bd.Immigration App.1989) ("Foreign law is a matter to be proven by the party seeking to rely on it"). Requiring the INS to prove a foreign law in support of its contention that Sadeghi's fear is of prosecution rather than persecution does not shift Sadeghi's burden of proving refugee status. To suggest otherwise places on Sadeghi the burden of proving not only his own contentions but those of the INS.[4]

Assuming, contrary to known facts, the INS were to prove the existence of Iranian laws conscripting fourteen-year-old boys and criminalizing those who discourage them from going to war, there is no evidence in the record that "an actual, legitimate, criminal prosecution" was initiated against Sadeghi pursuant to such laws. *See Blanco–Lopez v. INS*, 858 F.2d 531, 534 (9th Cir.1988). Moreover, the Supreme Court has looked to the ordinary meaning of the phrase "persecution on account of ... political opinion" and construed it as "persecution on account of the victim's political opinion, not the persecutor's." *Elias–Zacarias*, 504 U.S. at —, 112 S.Ct. at 816. *See Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir.1994). Thus, whether the Iranian government attempted to arrest

Sadeghi based on its belief that he had contravened the law, rather than on its political opinion, is not at issue. What is clear is that Sadeghi's counselling of Hassan implied a political opinion which marked him for persecution by the authorities.

Finally, even if such laws were proven, they would conflict with the "universally held ideal that children should not be involved in armed combat." *See* Colleen C. Maher, Note, *The Protection of Children in Armed Conflict: A Human Rights Analysis of the Protection Afforded to Children in Warfare*, 9 B.C. Third World L.J. 297, 300 (1989).[5]

"The conscious desire of the international community to protect children has its roots in traditional noncombatant protection, designed to protect the innocent civilian population, as articulated in the Geneva Convention of 1949." *Id.*[6] In pursuit of this desire, on November 20, 1989, the United Nations General Assembly adopted the Convention on the Rights of the Child, U.N.Doc. A/44/736 (1989), *reprinted in* 28 I.L.M. 1457 (1989). Article 38 of the convention states:

1. States Parties undertake to respect and to ensure respect for rules of international humanitarian law applicable to them in armed conflicts which are relevant to the child.

2. States Parties shall take all feasible measures to ensure that persons who have not attained the age of *fifteen years* do not take a direct part in hostilities.

---

4. Under Federal Rule of Civil Procedure 44.1 a court can conduct its own research on foreign law when an issue is raised. However, here the INS, by not even citing any foreign law text on which it relies, has not made sufficient showing for a court to "invest its limited resources on its own inquiry." *See United States v. Klimavicius*, 620 F.Supp. 667, 668 n. 2 (D.Me.1985).

5. This article addresses the protection of the rights of children during internal and international conflict. Maher notes

[o]ne of the few recognized instances of a [1977 Protocol to the Geneva Convention] violation against children was noted in the Islamic Republic of Iran by the U.N. in 1983. The Iranian actions were specifically addressed in a special report to the U.N. in 1983. The report cited numerous instances where children had been used as soldiers in the war against Iraq. This finding was further sup-

ported by statistics on the number of Iranian children seized during combat and placed in Iraqui [sic.] prisoners-of-war camps.... *The use of children in combat by Iran was perceived not only as a violation of the Protocols but also as a violation of humanitarian laws articulated in the U.N. Charter.*

9 B.C. Third Word L.J. at 315 (footnotes omitted) (emphasis added).

6. Article 4(3)(c) of Protocol II to the Geneva Convention forbids the recruitment of children under the age of fifteen into the armed forces. The United States is a signatory to this convention. *See* Human Rights Watch/Africa Human Rights Watch Children's Rights Project, *Easy Prey Child Soldiers in Liberia* (1994) at 49–51 (discussing international law regarding the use of child soldiers).

3. States Parties shall refrain from recruiting any person who has not attained the age of *fifteen years* into their armed forces. In recruiting among those persons who have attained the age of fifteen years but who have not attained the age of eighteen years, States Parties shall endeavour to give priority to those who are oldest.

4. In accordance with their obligations under international humanitarian law to protect the civilian population in armed conflicts, States Parties shall take all feasible measures to ensure protection and care of children who are affected by an armed conflict.

*Id.*, Art. 38 (emphasis added).

The Convention on the Rights of the Child has been ratified by 166 nations, including Iran! Moreover, it has attained the status of customary international law. Therefore, even assuming the existence of the supposed Iranian laws, to recognize prosecution thereunder as a legitimate exercise of governmental authority would conflict with fundamental human rights under both the Geneva Convention and customary international law.

I therefore find no substantial evidence to support the BIA's finding that Sadeghi's evidence did not establish a well-founded fear of prosecution rather than persecution. Because I reach this conclusion, I address the second ground on which the BIA found Sadeghi had not established a well-founded fear of persecution, namely because it found weaknesses in the testimony of Sadeghi and his two witnesses. Cert.Admin.R. at 6–7.

Contrary to what occurred in this case, the BIA normally gives great weight to the IJ's credibility determination. *Estrada v. INS,* 775 F.2d 1018, 1021 (9th Cir.1985) (holding "[b]ecause the immigration judge is in the best position to evaluate an alien's testimony, his or her credibility determinations are to be given 'much weight.'") Here, the IJ cut short Sadeghi's presentation of his case at various intervals, indicating his satisfaction with the credibility of Sadeghi and his witnesses. *Id.* at 107–08, 130. The IJ even prevented Sadeghi's counsel from calling other witnesses who would provide corroborating testimony, stating, "Ms. Choi, I'm going to cut off any further examination. Do you have any of the other witness like this? I'm satisfied ... the only question in my mind is a question of resettlement." *Id.* at 129–30. The IJ iterated "as far as I'm concerned now, this ... from what I've heard, if he goes back to Iran, he's going to have problems. That doesn't bother me. But this issue of this hiatus of some five years ..." *Id.* at 130.

In his oral decision, the IJ stated he had "been impressed with the testimony of the respondent." *Id.* at 31. The IJ clearly was so convinced by the evidence presented by Sadeghi concerning his well-founded fear, that he prevented Sadeghi from producing evidence in this regard which may have clarified apparent discrepancies in the evidence noted by the BIA.

The BIA failed to take these factors into consideration when it noted "certain weaknesses in [Sadeghi's] testimony." *Id.* at 6. Rather, the BIA chose to focus selectively on discrepancies which it found "the respondent has not explained," *id.*, and "questioned the veracity of [Sadeghi's] two witnesses," *id.* at 7. It is fundamentally unfair to any person to be prevented from presenting further evidence because the hearing officer is already persuaded on the issue, and then later to be condemned by the reviewing agency for discrepancies in the evidence which may have been resolved or outweighed by further testimony. Such procedural anomaly is a violation of due process under even the most restrictive definition of the term.

Even accepting the discrepancies noted by the BIA, the evidence presented by Sadeghi as a whole supported a finding of a well-founded fear of persecution. Substantial evidence did not support the BIA's finding that Sadeghi failed to establish a well-founded fear of persecution based on a lack of credibility of Sadeghi and his witnesses.

I therefore conclude Sadeghi met the statutory requirements for establishing refugee status for the purpose of seeking asylum. Accordingly, the next step of the asylum procedure is for the Attorney General to apply her discretion to grant or deny asylum. *Nguyen v. INS,* 991 F.2d 621, 625 (10th Cir.1993).

Because I reach this conclusion, I address whether Sadeghi met the higher standard for withholding of deportation. *See Nguyen,* 991 F.2d at 626. To meet this standard "[t]he alien must demonstrate a 'clear probability of persecution' with 'objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation.' " *Kapcia,* 944 F.2d at 709 (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 430, 107 S.Ct. 1207, 1212, 94 L.Ed.2d 434 (1987)). I conclude the unrefuted evidence of Sadeghi and his witnesses meets this higher standard. Accordingly, the Attorney General should withhold deportation. *See* 8 U.S.C. § 1253(h)(1).

I think the final deportation order and denial of application for asylum entered by the BIA should be reversed. What emerges from this record for me is a blatant violation of due process, a clear violation of established precedent and a deep sense that the INS is crunching numbers and ignoring the very purpose of our immigration laws as intended by Congress. I recognize that the INS is confronted with an enormous volume of cases, but the use of a utilitarian calculus, in my view, does not justify a departure from due process of law or the taking of short cuts which clearly endanger the safety and indeed life of this individual.