**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 14, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

YINEN ZHENG,

      Petitioner,

  v.

ALBERTO R. GONZALES,
Attorney General,

      Respondent.

No. 05-9593
(No. A97-477-138)
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRORBY** and **EBEL,** Circuit Judges, and **KANE,**[**] District Judge.

---

Petitioner Yinen Zheng seeks review of a final order of removal issued by

the Board of Immigration Appeals (BIA), affirming an immigration judge's (IJ)

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]    The Honorable John L. Kane, Senior District Judge, United States District Court for the District of Colorado, sitting by designation.

denial of his applications for asylum and restriction on removal.[1]  Because we conclude that substantial evidence supported the IJ's finding that Mr. Zheng fled his homeland to avoid criminal prosecution rather than persecution, we deny the petition for review.

## I. BACKGROUND

*Petitioner's Allegations*

Mr. Zheng, a native of The People's Republic of China, was apprehended on January 4, 2004, for entering the United States without inspection.  In removal proceedings initiated that same day, he conceded that he is properly subject to removal, but claimed that he if he is returned to China, he will be persecuted on account of his previous political activity.

At a hearing before the IJ, Mr. Zheng told the following story.  He began working for a large state-run bakery in the Fujian Province in June 2002 right after he graduated from middle school.  On the morning of November 1, 2003, he reported to work to find that the doors were locked, and the bakery apparently closed.  At the time, he was owed three months wages.  A week later, the bakery was still closed, and Mr. Zheng still had not been paid.  Since the bakery was a

---

[1]     The IJ also denied Mr. Zheng's request for restriction on removal pursuant to the Convention Against Torture (CAT).  Mr. Zheng does not challenge that ruling in his appeal before this court, however, and accordingly has waived any arguments concerning the denial of relief under the CAT. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

state-owned enterprise, its employees' wages were dispensed through the government's labor department. Accordingly, on November 10, 2003, Mr. Zheng went to the local office of the labor department and demanded his backpay, only to be told that nothing could be done. Mr. Zheng became irate and was escorted out.

On the morning of November 18, 2003, Mr. Zheng and about twenty other disgruntled workers protested outside the closed gates of the bakery. They held up banners made from bed sheets saying "pay us back quickly," and "pay us money." Admin. R. at 127. Mr. Zheng led the group in shouting the same slogans. The police arrived in about half an hour to break up the protest. Mr. Zheng approached one of the officers and attempted to explain the workers' plight, but was pushed to the ground. The officer told him that if he did not leave immediately, he would be arrested. The crowd dispersed. Mr. Zheng organized another protest, however, for later that day in front of the labor department. The group held up the same banners and shouted the same slogans, and again, the police arrived quickly. This time Mr. Zheng was arrested, taken into custody, and interrogated.

One of the police officers who interrogated him asked him if he knew that it was illegal to protest without giving notice to the police. When Mr. Zheng declined to answer, the officer slapped him and another officer hit him in the head with a notebook. For three days, he was locked in a small, cold room without a

bed or a blanket. He was given only one meal a day and hardly any water, and he was regularly kicked when his meal was delivered. For a toilet he was forced to use a bucket that was never emptied. When he grew ill from these conditions, he was denied medical care. He was released on November 21, 2003, and told that he would not be released again if he engaged in further protests.

Despite this warning, Mr. Zheng organized a third protest because he "just want[ed] to get [his] money back" and because he wanted to call attention to the government's corruption. *Id*. at 140. The protest took place on November 29, 2003, on busy street in Changle City in the Fujian Province. This time, the demonstrators held up signs and shouted slogans advocating that the communist party be overthrown and demanding that workers' basic rights be respected. When the police arrived, Mr. Zheng escaped. Knowing he would be found if he returned home, he went into hiding until the arrangements could be made for his travel to the United States.

Mr. Zheng testified that he is wanted in China for advocating the overthrow of the communist government. He believes he will spend the rest of his life in prison if he is forced to return. He submitted two documents from the Changle City Public Security Bureau, translated into English from Mandarin. According to the translations, the documents are "Criminal Punishment Records." *Id*. at 313, 315. One of the documents states that Mr. Zheng was taken into custody on November 18, 2003, for the crime of demonstrating at the door of the Changle

City Labor Bureau.  The other document accuses Mr. Zheng of committing the crime of "revolution rebellion" before escaping abroad.  *Id*. at 315.  Mr. Zheng testified that this second document, which was obtained by his father after Mr. Zheng left China, is a warrant for his arrest.  He claims that this document proves that he is subject to persecution by the Chinese authorities for challenging the revolution, i.e., disobeying the communist Chinese government.  He also argues that his arrest and detention constituted persecution based on political opinion because he was arrested due to the express political content of the protests that he led in front of the bakery and labor department.

*The IJ's Decision*

On October 28, 2004, the IJ issued a decision denying Mr. Zheng's requests for asylum and restriction on removal.  He found Mr. Zheng's testimony to be credible, but held that what happened to Mr. Zheng did not constitute political persecution.  Instead, the IJ found that Mr. Zheng had fled China to avoid prosecution for violating his country's laws of public assembly and/or evading arrest.  The IJ found that Mr. Zheng's motivation for protesting in front of the bakery and labor department was "exclusively economic in nature and articulation."  *Id*. at 58.  The third protest, the IJ recognized, involved some political content, but he nonetheless held that Mr. Zheng had failed to show that his actions "elicited or will elicit a persecutorial reaction from the Chinese government."  *Id*.

The IJ conceded that the warrant charging Mr. Zheng with revolution rebellion could be read as political, but on the other hand, he held that the reference to the revolution could be no more than "obligatory homage to the Communist Revolution and therefore have no political implications or content whatsoever." *Id.* at 59, n.6. Given that the warrant was the only instance in the record reflecting any political motivation on the part of the Chinese government and that the warrant itself was ambiguous, the IJ concluded that Mr. Zheng had failed to demonstrate an improper motive behind the criminal charge. Moreover, since there was no evidence of the punishment awaiting Mr. Zheng in China, the IJ concluded that notwithstanding China's poor human rights record, he could not infer that the punishment would be disproportionate to Mr. Zheng's transgression of the law and therefore could not infer persecutorial intent from the punishment alone.

*The BIA's Decision*

On October 12, 2005, the BIA issued a decision adopting and affirming the IJ's decision because it agreed that Mr. Zheng "did not adequately establish that his claim [was] linked to one of the five enumerated grounds for asylum or withholding of removal." *Id*. at 2. The BIA also concluded that information contained in the State Department's most recent report on China concerning labor demonstrations, which Mr. Zheng had submitted on appeal, did not change the result in his case.

## II. ANALYSIS

*Introduction*

"An alien who fears persecution if removed from the United States has two possible avenues of relief: asylum and restriction on removal." *Elzour v. Ashcroft*, 378 F.3d 1143, 1148 (10th Cir. 2004). In order to be eligible for asylum, an alien must establish that he is a refugee, meaning that he is outside of his country of nationality and unable or unwilling to return due to persecution or a well-founded fear of persecution based on race, religion, nationality, membership in a particular social group or political opinion. *Id.* at 1148-49; 8 U.S.C. § 1101(a)(42). Once an alien establishes that he is a refugee, the Attorney General exercises his discretion in deciding whether or not to grant asylum.

Restriction on removal, however, is not discretionary. If an alien can establish a clear probability that he will be persecuted based on one of the above grounds if returned to a particular country, he may not be removed to that country. *See* 8 U.S.C. § 1231(b)(3)(A). Therefore, the test for restriction on removal is "more demanding than the 'well-founded fear' standard applicable to an asylum claim. *Elzour*, 378 F.3d at 1149 (quotation omitted).

*Standard of Review*

In reviewing a final order of removal, "[w]e consider any legal questions de novo, and we review the agency's findings of fact under the substantial evidence

standard. Under that test, our duty is to guarantee that factual determinations are supported by reasonable, substantial and probative evidence considering the record as a whole." *Id.* at 1150. In order to reverse the agency's decision to deny asylum, we must conclude that "the evidence not only *supports* [a grant of asylum], but *compels* it." *I.N.S. v. Elias Zacarias*, 502 U.S. 476, 481 n.1 (1992). Thus, Mr. Zheng must show that "the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Id.* at 483-84.

In cases such as this, where the BIA adopts the opinion of the IJ with only the briefest of explanations, we include the IJ's analysis in our review. *See Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006) (holding that resort to the IJ's decision is appropriate when "the IJ's analysis is all that can give substance to the BIA's reasoning in its order of affirmance."). Finally, we confine our review to the reasons given by the agency and do not "independently search the record for alternative bases to affirm." *Elzour*, 378 F.3d at 1150.

*Persecution versus Prosecution*

Mr. Zheng claims that the IJ's finding that the arrest warrant accusing him of revolution rebellion could reflect legitimate prosecutorial action is flatly contradicted by the evidence. He argues that substantial evidence supports his contention that he was arrested and persecuted for voicing his political opinion and not merely for disturbing the peace. He further argues that his three-day

detention amounted to political persecution and demonstrates that he has a well-founded fear of future persecution if returned to China.[2]

"The well-founded fear of persecution standard . . . involves both a subjective 'fear' component, and an objective 'well-founded' component." *Sadeghi v. INS*, 40 F.3d 1139, 1142 (10th Cir. 1994). In this case, the IJ stated that he believed Mr. Zheng's story, including his subjective fear of returning to China. We have held that such subjective fear is not relevant, however, unless and until the petitioner proves the objective "well-founded" component. *Id.* This is where Mr. Zheng's case fails. It is well established that "the alien has the burden of proving the objective component through credible, direct, and specific evidence of facts that would support a reasonable fear that he faces persecution." *Id.* Thus, it was Mr. Zheng's burden to prove that the Chinese government seeks to persecute him for political dissent and not prosecute him for disobeying its laws of assembly. As we stated in *Sadeghi*,

> While we have no quarrel with the proposition that not all arrests are related to legitimate criminal prosecutions, the question is whether the petitioner's evidence *compels* the conclusion that his

---

[2] Mr. Zheng also claims that the IJ's findings were in violation of several international treaties to which the United States is a party, including the 1951 United Nations Convention Relating to the Status of Refugees, the Universal Declaration of Human Rights, and the Helsinki Final Act. These arguments, however, were not made in his appeal to the BIA, and accordingly, we will not consider them here. *See Rivera-Zurita v. INS*, 946 F.2d 118, 120 n.2 (10th Cir. 1991) ("Judicial review does not extend to points the alien could have made before the Board but did not.").

> attempted arrest . . . [was] for persecution because of a statutory factor. . . . Prosecution for illegal activities is a legitimate government act and not persecution as contemplated by the [Immigration and Nationality] Act.

40 F.3d at 1142 (emphasis added) (quotation omitted).

The record in this case does not compel a finding that the Chinese government's arrest and detention of Mr. Zheng was based on the political nature of his activities or that it seeks to persecute Mr. Zheng for his political views. It is clear from Mr. Zheng's own testimony that the chief motivation for his protests was economic – he wanted his backpay. The record does not support his argument that either of the protests that occurred on November 18, 2003, were political in nature or deemed as such by the police. He testified that he and his co-workers carried posters and shouted slogans, "like pay us back, pay us back. You don't care . . . officer covers officer." Admin. R. at 126. While these and other slogans that were shouted certainly could be deemed critical of the government, the evidence does not compel the conclusion that Mr. Zheng was arrested for voicing such criticism. His testimony reveals no political animus on the part of the police officers who arrested, interrogated, and detained him, and the Criminal Punishment Record of the encounter reflects only that Mr. Zheng was arrested for "his demonstration at the door of the Changle City Labor Bureau." *Id.* at 313. The IJ was not compelled to find on these facts that Mr. Zheng's arrest was politically motivated.

The evidence does reflect that by the time of his third protest on November 29, 2003, Mr. Zheng was livid with the Chinese government bureaucracy, and he made his feelings known by expressly denouncing the communist party. It is also true, however, that by the time of this third protest, Mr. Zheng had been warned several times against disturbing the peace. He and his co-workers nonetheless situated the protest on one of the busiest streets in Changle City. When the police arrived, he understandably did not stop to inquire about the nature of what would have been his immediate arrest. This leaves us, however, with an incomplete picture of the Chinese government's motivations.

It is quite possible, given the government's record of quashing political dissent, that the police were more concerned with what the protesters were saying than the manner in which they were saying it, but the record does not compel that finding. The thrust of the demonstration was economic rather than political in nature, and there is scant evidence that the protestors in general, and Mr. Zheng in particular, held any political views beyond that state-owned enterprises should treat the labor force fairly. Moreover, Mr. Zheng submitted no evidence that any of his fellow protesters were jailed or subjected to any other form of punishment for participating in the November 29 demonstration.[3]

---

[3] Mr. Zheng did submit letters from two individuals who claimed to have participated in the November 18, 2003, protest and to have been arrested with Mr. Zheng for "destroy[ing] the public order." Admin. R. at 293, 295. Neither of the

(continued...)

As we stated earlier, Mr. Zheng had the burden of proving that he is being sought after by the Chinese government for purposes of persecution and not for the legitimate purpose of criminal prosecution. *See Sadeghi*, 40 F.3d at 1142. It is not sufficient that some of the evidence supports Mr. Zheng's political asylum claim or that another factfinder could reach a different conclusion. Mr. Zheng had to show that the evidence *compelled* no other conclusion but that he would be subject to persecution if returned to China. *Elias Zacarias*, 502 U.S. at 483-84. A careful review of the record reveals that he failed to meet that high burden. Therefore, given the deferential standard of review applicable to these proceedings, we must affirm the agency's decision to deny Mr. Zheng's asylum application. It follows that the denial of his request for restriction on removal must also be affirmed. *See Elzour*, 378 F.3d at 1149 (explaining that restriction

[3](...continued)
letters speak to the events of November 29, 2003, however, and interestingly, both letters have return addresses in Fujian Province, where the demonstrations took place. Although Mr. Zheng testified that the individuals who sent the letters must be in hiding, he offered no evidence to support that contention or any other evidence that the individuals were persecuted for their participation in the November 29, 2003, demonstration.

on removal encompasses a more demanding standard than that applicable to asylum claims).  The petition for review is, therefore, DENIED.

Entered for the Court

John L. Kane
District Judge