**MODIFIED OPINION**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SIMMON Y. MENGHESHA,

　　　　　　　　　　*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

　　　　　　　　　　*Respondent.*

No. 04-1716

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A79-235-494)

Argued: November 29, 2005

Decided: March 13, 2006

Modified Opinion Filed: June 14, 2006

Before WILLIAMS, KING, and GREGORY, Circuit Judges.

---

Petition for review granted; vacated and remanded by published opinion. Judge Gregory wrote the majority opinion, in which Judge King joined. Judge Williams wrote a separate dissenting opinion.

---

**COUNSEL**

**ARGUED:** David Allen Garfield, Washington, D.C., for Petitioner. Theodore Charles Hirt, Trial Attorney, U. S. DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Civil Division, Washing-

ton, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Civil Division, Margaret Perry, Senior Litigation Counsel, U. S. DEPARTMENT OF JUSTICE, Office of Immigration Litigation, Civil Division, Washington, D.C., for Respondent.

---

## OPINION

GREGORY, Circuit Judge:

Simmon Y. Menghesha fled his native country of Ethiopia on July 8, 2001, the day he learned that government officials had discovered his role in thwarting the arrest of anti-government protestors. The following day, Menghesha arrived in the United States and sought asylum under Section 208(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(a). Menghesha maintained that if returned to Ethiopia, he would suffer arrest, imprisonment, and torture on account of the political opinion he expressed through verbal critiques of the government and by his actions to frustrate the arrest of nonviolent protestors. The Immigration Judge ("IJ") denied Menghesha's asylum request based on a belief that the Ethiopian government desired to prosecute Menghesha for obstruction of justice. The IJ failed, however, to consider whether the government possessed coexisting illicit motives for taking action against Menghesha. The Board of Immigration Appeals ("BIA") affirmed the IJ's determination, rendering Menghesha removable to Ethiopia. Because we find that the IJ misapplied the law in denying Menghesha's request for asylum, we grant Menghesha's petition for review, vacate the BIA's decision, and remand for further proceedings.

I.

Following is a recitation of undisputed facts adduced in Menghesha's asylum application and hearing testimony. In the absence of contrary evidence or an adverse credibility determination, we accept Menghesha's uncontested account as true. Menghesha was born in Addis Ababa, Ethiopia on May 15, 1976. After graduating from high school, he became actively involved in the Ethiopian People's Revolutionary Democratic Front and Tigray People's Liberation

Front ("EPRDF/TPLF"), the political party presently in power. In November 1997, having been identified as a committed EPRDF/TPLF member, Menghesha was offered a position with the government's security services. After six months of training, Menghesha was assigned to a government security detail.

As a member of the security detail, Menghesha was directed to spy on meetings of groups opposed to the government. Menghesha first carried out this task in September 1999, when, undercover, he attended a meeting of the All Amhara People's Organization on the occasion of the death of that organization's leader. During the meeting, the leader of the undercover team summoned the riot police to suppress the allegedly unruly crowd. On their arrival, the riot police began to beat and arrest attendees who refused to disperse. Those who were arrested were detained for two days without bathroom access. Menghesha expressed his discontent about how the attendees were treated in a subsequent security meeting. At that time, his superiors warned him not to criticize the government and told him that such conduct "would harm [him]." J.A. 184.

In April 2001, Menghesha was assigned to a six-member undercover team to identify anti-government behavior at a meeting organized by the head of the Ethiopian Human Rights Council. Because Menghesha did not observe any illegal conduct, he did not furnish any information leading to arrests. Consequently, government officials accused him and his colleague Yohannes Assefa of being "in sympathy" with the opposition, threatened them with arrest, and told them they would be watched closely. J.A. 69, 185.

About a week later, Menghesha's undercover team attended a meeting of disgruntled Addis Ababa University students. While a high-ranking security officer negotiated with students regarding their demands for increased freedom, Menghesha and his colleagues interacted with other students and collected information on student leaders. When negotiations failed, the security team received orders to arrest five students identified as opposition leaders. The team was directed to use "any means necessary" to effectuate the arrests, including deadly force. J.A. 185. Menghesha was "disturbed" by the order to use deadly force. *Id.* at 71. He felt "the students were asking the

right questions" and could not comprehend "why the government [was] behaving this way." *Id.*

Menghesha discussed the arrest orders with Assefa. Disgusted by what was transpiring, they resolved to warn the five students in question. Having seen others beaten and killed upon arrest, Menghesha feared that the students would meet the same fate unless he intervened. J.A. 74. Further, he sympathized with the students because their request was "right and peaceful." *Id.* at 77. When the security officers arrived on campus to make arrests, the five students were gone, although other security teams arrested those students they were assigned to locate. Word of the arrests spread, and students mobilized to resist and protest. Troops moved in to control the students and a deadly riot ensued.

Thereafter, the security department began to investigate who had warned the five students. Menghesha and Assefa came under suspicion when security department officials learned that they had been at the university on the afternoon before the arrests, a fact they had failed to report. As there was no proof of wrongdoing, the security department modified the men's duties pending further investigation, but took no other action.

On July 8, 2001, Menghesha and Assefa learned that their role in thwarting the arrests had been discovered by government officials. That same day, Menghesha and Assefa boarded a plane bound for the United States. With that, Menghesha fled the country, without saying goodbye or retrieving any belongings, and despite his apparent plans to marry. On arrival the next day, the two surrendered to immigration authorities and told their story.

At his asylum hearing, Menghesha introduced documentary evidence, including the State Department's Country Report on Ethiopia, to substantiate his testimony. Although Assefa was available to testify, the parties simply stipulated to his corroborative testimony. The Immigration and Naturalization Service ("INS") did not introduce evidence at the hearing, offering only opening and closing remarks.[1]

---

[1]On March 1, 2003, the INS's responsibilities were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 451, 471, 116 Stat. 2135, 2195, 2205 (2002).

After reviewing the evidence, the IJ denied Menghesha's requests for asylum and withholding of removal. The IJ expressed the view that as "a sworn law enforcement official . . . it was not for [Menghesha] to pick and choose among which of the persons he was directed to arrest." J.A. 225. He stated, "if [Menghesha] took exception to any action that the government might engage, including the arrest of students who were expressing their opposition to the government of Ethiopia, [Menghesha] had it within his ability to resign from his position as a law enforcement official." *Id.* at 225-26. The IJ concluded that "[Menghesha] fears prosecution for his criminal act of obstruction of justice," and that this "may not form the rational basis upon which the Court can conclude that he would be persecuted on account of his political opinion or any of the four remaining bases upon which asylum may be granted." *Id.* at 226. The IJ thus denied Menghesha's asylum request without making additional factual findings that might undermine Menghesha's entitlement to asylum.

On May 11, 2004, the BIA affirmed the IJ's decision without opinion. Menghesha timely appealed the BIA's order, challenging only the denial of his petition for asylum.

II.

Section 208(b)(1) of the INA, 8 U.S.C. § 1158(b)(1), gives the Attorney General authority to grant asylum to an alien meeting the statutory definition of a refugee. Under the INA, a refugee is someone who is unable or unwilling to return to his home country due to a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). To satisfy this test, an asylum applicant "must demonstrate the presence of a protected ground and he must link the feared persecution, at least in part, to it." *Saldarriaga v. Gonzales*, 402 F.3d 461, 466 (4th Cir. 2005), *petition for cert. filed*, 74 U.S.L.W. 3130 (U.S. Aug. 25, 2005) (No. 05-266).

Where, as here, the BIA engages in the streamlined review process set forth in 8 C.F.R. § 1003.1(e)(4) by simply adopting the IJ's conclusion without opinion, the IJ's decision becomes the final agency decision subject to our review. *See Camara v. Ashcroft*, 378 F.3d 361, 366 (4th Cir. 2004); *see also* 64 Fed. Reg. 56,138 (Oct. 18, 1999)

(When the BIA summarily affirms the IJ's decision, "the Immigration Judge's decision becomes the decision reviewed."). Accordingly, the IJ's findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We review the IJ's legal conclusions de novo, giving appropriate deference to its interpretations of the INA. *Nwolise v. INS*, 4 F.3d 306, 309 (4th Cir. 1993) (citing *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-45 (1984)). The IJ's ultimate decision with regard to Menghesha's eligibility for asylum must be upheld unless it is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D) (2000); *see also Li v. Gonzales*, 405 F.3d 171, 175 (4th Cir. 2005); *Saldarriaga*, 402 F.3d at 465; *Ngarurih v. Ashcroft*, 371 F.3d 182, 188 (4th Cir. 2004); *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 284 (4th Cir. 2004). An IJ abuses its discretion in making an error of law. *See United States v. Pearce*, 191 F.3d 488 (4th Cir. 1999) (citing *Koon v. United States*, 518 U.S. 81, 100 (1996)).

Thus, where, as here, the IJ misapplies the law in evaluating a request for asylum, the appropriate remedy is to remand so that the agency may apply the correct legal standard in the first instance. *See INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam) (stating that remand is required where the agency has yet to address a legal question pertinent to the asylum determination). *See also Phommasoukha v. Gonzales*, 408 F.3d 1011, 1015 (8th Cir. 2005) ("When the BIA applies an incorrect legal standard, the proper remedy typically is to remand the case to the agency for further consideration in light of the correct standard."); *accord Qiu v. Ashcroft*, 329 F.3d 140, 157 (2d Cir. 2003); *Griffiths v. INS*, 243 F.3d 45, 55 (1st Cir. 2001); *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998); *Martinez-Sanchez v. INS*, 794 F.2d 1396, 1399 (9th Cir. 1986).

### III.

In denying Menghesha's request for asylum, the IJ committed legal, if not factual, error. In this respect, this case must be distinguished from the many instances in which we have considered whether the BIA's factual findings justified a denial of asylum. *See, e.g.*, *Saldarriaga*, 402 F.3d at 465-67; *Ngarurih*, 371 F.3d at 188-89; *Blanco de Belbruno*, 362 F.3d at 284-85. We resolved those cases

under the extremely deferential standard of review applicable to factual determinations. In this instance, however, we are concerned with the IJ's legal conclusions, not factual findings. We find that the IJ erred as a matter of law in holding Menghesha to an overly stringent legal standard: proving that political persecution was the government's sole motive.

Specifically, the IJ erred in discontinuing his inquiry after identifying the Ethiopian government's arguably legitimate motive to prosecute Menghesha.[2] Under the INA's "mixed-motive" standard, an

---

[2]In using the term "prosecution," the IJ seized upon the principle, found in *In re Nagy*, 11 I. & N. Dec. 888 (BIA 1966) and its progeny, that prosecution for a criminal violation does not alone constitute persecution. This important principle respects a government's freedom to devise its own laws and penalties for criminal conduct. In stating that "[o]bstruction of justice may not form the rational basis upon which the Court can conclude that [Menghesha] would be persecuted on account of his political opinion . . . [,]" the IJ, however, broadened the rule of *In re Nagy*, by suggesting that prosecution never amounts to persecution. In fact, where the motive underlying a purported prosecution is illegitimate, such prosecution is more aptly called persecution. *See, e.g.*, *Abdel-Masieh v. INS*, 73 F.3d 579, 584 (5th Cir. 1996) ("While punishment of criminal conduct in itself is not persecution, where that punishment . . . is motivated by one of the specified grounds, such punishment would constitute persecution under the [INA]."); *accord Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001); *Fisher v. INS*, 79 F.3d 955, 962 (9th Cir. 1996); *Sadeghi v. INS*, 40 F.3d 1139, 1142 (10th Cir. 1994).

Moreover, the IJ's conclusion that Menghesha fears prosecution is troubling, because typically "[f]oreign law is a matter to be proven by the party seeking to rely on it . . . ." *In re Soleimani*, 20 I. & N. Dec. 99, 106 (BIA 1989); *see also Abdille v. Ashcroft*, 242 F.3d 477, 490 (3d Cir. 2001). Although "[o]rdinarily, it is the asylum applicant who seeks the benefit of foreign law, and thus carries the burden of demonstrating its content," *Abdille*, 242 F.3d at 490, in this instance, the INS relied on foreign law by claiming that Menghesha feared prosecution under Ethiopian law. Thus, after Menghesha produced evidence to show that the Ethiopian government had an illegitimate motive to persecute him, the INS bore the burden of offering evidence of the Ethiopian law that it contends Menghesha violated in thwarting the warrantless arrest of nonviolent protestors. *But see Sadeghi v. INS*, 40 F.3d 1139, 1142-43 (10th Cir. 1994) (declining to place the burden of proving foreign law on the INS where the petitioner failed to produce evidence sufficient to show that the Iranian government had any illegitimate motive for persecuting him).

asylum applicant need only show that the alleged persecutor is moti-
vated *in part* to persecute him on account of a protected trait.**³** Recog-
nizing that persecutors often have multiple motives for punishing an
asylum applicant, the INA requires only that an applicant prove that
one of those motives is prohibited under the INA. *See, e.g.*, *Mohideen
v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005) ("the [INA's] refer-
ence to persecution 'on account of' one of the specified grounds does
not mean persecution solely on account of one of those grounds.");
*accord Lukwago v. Ashcroft*, 329 F.3d 157, 170 (3d Cir. 2003) (citing
*Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997)); *Girma v. INS*,
283 F.3d 664, 667 (5th Cir. 2002); *Borja v. INS*, 175 F.3d 732, 735
(9th Cir. 1999) (en banc); *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir.
1994); *In re S-P-*, 21 I. & N. Dec. 486, 490 (BIA 1996). Thus, even
assuming that the Ethiopian government had a lawful non-political
motive for prosecuting Menghesha, the IJ had an obligation to con-
sider the evidence of political motive. In other words, an IJ may not
"treat[ ] the presence of a nonpolitical motive as evidence of the
absence of a political motive." *Tarubac v. INS*, 182 F.3d 1114, 1118
(9th Cir. 1999). Indeed, in *In re Nagy*, the BIA did not dismiss the
possibility of an impermissible motive purely because there was a
valid basis for prosecuting the applicant, namely her violation of the
time limits placed on her travel abroad. 11 I. & N. Dec. at 891-92.
Rather, the BIA searched the record for evidence of an unlawful per-
secutory motive. *Id.* at 889. Finding no evidence of impermissible
motive, the BIA denied the relief sought. *Id.* at 891-92.

Unlike the BIA in *In re Nagy*, the IJ here did not consider the
uncontested evidence of political motive. For instance, the IJ did not
address the fact that: (1) Menghesha was threatened with "harm" if he

---

**³**The Attorney General argues at great length that we do not have juris-
diction to review Menghesha's claim of mixed-motive persecution
because he did not advance an argument of mixed-motive persecution
before the IJ. Br. for Resp't at 41-44. We disagree. In asking us to assess
his claim under a mixed-motive standard, Menghesha is not alleging a
distinct legal claim. Rather, he is merely elucidating the proper legal
standard, that the impermissible basis for persecution need not be the
*sole* basis for persecution. Thus, we will (and we must) apply the proper
legal standard regardless of whether Menghesha argued it affirmatively
before the IJ.

continued to criticize the government's handling of dissidents; (2) he was accused of being "in sympathy" with the student protestors; and (3) he was subjected to close scrutiny and threatened with arrest for sympathizing with the students. In this respect, the IJ failed to comply with *In re Nagy*, and effectively held Menghesha to a more onerous standard than is required under the INA. We conclude that the IJ's analysis of Menghesha's asylum claim was incomplete. Accordingly, we set aside the IJ's determination, which was manifestly contrary to law and an abuse of discretion, and remand so that the agency may evaluate Menghesha's entitlement to asylum according to the correct legal standard.[4]

IV.

For the reasons stated above, we grant the petition for review and vacate the BIA's denial of asylum. We, however, do not decide whether, applying the correct mixed-motive standard, Menghesha is entitled to asylum. Instead, we remand that such a determination may be made in the first instance.

*PETITION FOR REVIEW GRANTED; VACATED AND REMANDED*

WILLIAMS, Circuit Judge, dissenting:

I would deny Menghesha's petition for review and affirm the BIA. While I agree with the majority that the INA contains a "mixed-

---

[4]Finally, we address the suggestion implicit in the IJ's opinion that Menghesha's status as a law enforcement official undermines his entitlement to asylum. This belief may stem from a series of cases, which stand for the proposition that "dangers faced by policemen as a result of that status alone are not ones faced on account of race, religion, nationality, membership in a particular social group, or political opinion." *In re Fuentes*, 19 I. & N. Dec. 658, 661 (BIA 1988); *accord Estrada-Escobar v. Ashcroft*, 376 F.3d 1042, 1044 (10th Cir. 2004); *Chanco v. INS*, 82 F.3d 298, 302 (9th Cir. 1996). Those cases are inapposite. Menghesha fears reprisal from the government he served, which cannot seriously be characterized as one of the "dangers faced by policemen."

motive" standard and that we must remand the case if "the IJ misapplied the law," *ante* at 2, I believe the IJ properly applied the INA in determining that Menghesha failed to qualify for asylum. I view this as a typical fact-driven asylum case, where the IJ's factual determinations should be given great deference. For the reasons explained herein, I would respect Congress's will, follow Supreme Court precedent, and deny the petition for review. *See* 8 U.S.C.A. § 1158(b)(1)(A) (West 2005) (placing asylum decisions within the purview of the Secretary of Homeland Security and the Attorney General); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (recognizing "that judicial deference to the Executive Branch is especially appropriate in the immigration context").

I.

My colleagues' decision is based on their conclusion that the IJ failed to apply "the correct mixed-motive standard." *Ante* at 9. Respectfully, I disagree. In order to qualify as a refugee, Menghesha must show "a well founded fear of persecution *on account of* race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.A. § 1101(a)(42) (West 2005) (emphasis added). In this case, Menghesha argues that he fears persecution on account of his political opinion. The phrase "on account of" requires that Menghesha show that persecution *because of his* political opinion was *a* motivating force on the Ethiopian government, although not necessarily the *sole* motivating force. Thus, my colleagues are correct that Menghesha need only show that the Ethiopian government was motivated to persecute him *in part* because of his political opinion.

Where I part ways with the majority, however, is with its unsupported statement that the IJ required Menghesha to show that the government planned to persecute Menghesha based *solely* on his political opinion. *Ante* at 8. The IJ's oral opinion never stated that Menghesha must show that he fears persecution based solely on his political opinion. The IJ never stated that he was rejecting Menghesha's mixed motive argument as a matter of law. Menghesha, in fact, did not specifically make a "mixed motive" argument below.

As the majority properly recognizes, however, a petitioner need not make a "mixed motive" argument because the legal standard articu-

lated in the statute itself allows for the possibility of multiple motives. Thus, as was pointed out at oral argument, there is "no other kind of case" than a mixed motive case. Accordingly, Menghesha only needed to argue that he fell within the ambit of the statute, which is understood to mean that he was required to show, inter alia, that the government sought to persecute him at least *in part* because of a protected ground. Of course, in recognizing that Menghesha did not have to argue this point below because it is "merely" the "proper legal standard," *ante* at 8 n.3, it seems odd to require more of the IJ who elucidated the proper legal standard but simply did not expressly use the term "mixed motive;" if Menghesha need only argue that he falls within the INA's ambit, we should not require the IJ to say anymore than that Menghesha falls outside of that ambit. Indeed, the IJ correctly stated the applicable law. (*See* J.A. at 222-23 ("[Menghesha] must meet the definition of a refugee which requires him to show . . . that a reasonable person in his circumstances would fear persecution on account of one or more of the five protected enumerated grounds.").)

Moreover, the IJ found that Menghesha failed to show that it was more likely than not that he would be subject to persecution on account of his political opinion. "The IJ made a specific finding of fact that Menghesha "*failed to sustain his burden of proof and persuasion . . . that there is a reasonable possibility of his persecution in the future . . . on account of one or more of the five protected enumerated grounds.*" (J.A. at 223 (emphasis added).) *See, e.g.*, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) ("Whether an asylum applicant has demonstrated past persecution or a well-founded fear of future persecution is a factual determination reviewed under the substantial evidence standard."); *Jahed v. INS*, 356 F.3d 991, 1003 (9th Cir. 2004) (Kozinski, J., dissenting) ("Whether persecution is 'on account of' a petitioner's political opinion is a question of fact; it turns on evidence about the persecutor's motives."). In other words, in direct response to Menghesha's claimed fear of persecution based on his political beliefs, the IJ made an explicit *finding of fact* that Menghesha failed to show a fear of persecution based on his political beliefs. *See, e.g.*, *Bakhtriger v. Elwood*, 360 F.3d 414, 425 (3d Cir. 2004) ("The fact that there are legal principles that govern these matters . . . does not convert every question of fact or discretion into a question of law.").

We are thus left with a situation where the IJ found that Menghesha did not suffer a fear of persecution based on an enumerated ground and a majority opinion that disagrees with that *factual finding*.

To be sure, while applying the applicable law, the IJ made a further finding that Menghesha only "fears prosecution for his criminal act of obstruction of justice." (J.A. at 226.) That fear-of-criminal-prosecution finding, combined with the IJ's finding that Menghesha failed to show a reasonable possibility of future political persecution, leads ineluctably to the conclusion that the IJ found that Menghesha had a fear of prosecution for obstruction of justice *rather than* persecution for his political beliefs — *not* prosecution for obstruction of justice *in addition to* persecution for his political beliefs. Under such an understanding, there is no explicit "mixed-motive" analysis to undertake because the IJ found as a *matter of fact* that a mixed motive did not exist.[1] Despite my good colleagues' analysis, this case boils down to their underlying dissatisfaction with the IJ's factual determinations.[2] *Cf. Sebastian Sebastian v. INS*, 195 F.3d 504, 513 (9th Cir.

---

[1]Contrary to the majority's claim, the IJ did not "suggest[ ] that prosecution never amounts to persecution." *Ante* at 7 n.2. Rather, the IJ found that Menghesha had a "duty under the law and his badge of office." (J.A. at 225.) And as the majority points out, a court should recognize prosecution as persecution only when the "motive underlying [the] purported prosecution is illegitimate." *Ante* at 7 n.2. In this case, however, the IJ found that the government had a *legitimate* motive to prosecute Menghesha for failing to undertake his duty. This finding of a legitimate, non-political motive underlies the IJ's ultimate finding that the Ethiopian government was not motivated to persecute Menghesha at least in part because of his political opinion.

[2]What the majority does say is that the IJ erred in not considering the "uncontested evidence of political motive." *Ante* at 8. The evidence the majority cites, however, is not uncontested evidence of political motive any more than it is uncontested evidence of an obstruction of justice prosecutorial motive. For example, a government's motives are not normally thought of as political when it rightfully investigates one of its law enforcement officers suspected of aiding persons under criminal investigation. *See* Menghesha's Affidavit in Support of Political Asylum (J.A. at 185 (stating that he and two colleagues were "accused of not doing our *jobs properly* because we were in sympathy with the opposition") (emphasis added).) By claiming that the evidence in this case is evidence of a "political motive," when the IJ found that no such motive exists, the majority attempts to substitute its own findings of fact for those of the IJ.

1999) (Wigging, J., concurring) ("Because the administrative authorities determined that the . . . persecution was [based] solely [on non-political grounds], in the absence of evidence that *compels* a contrary conclusion I must consider this to be a case involving solely non-politically motivated persecution, rather than [a] mixed-motive persecution [case.]" (emphasis added)).

In sum, the IJ was not required to undertake a specific mixed-motive analysis. Rather, the IJ was required to examine the totality of the evidence in order to determine if Menghesha showed that the government was motivated to persecute him at least in part because of his political beliefs. This much the IJ did. If, as here, the IJ finds that a petitioner failed to meet his burden of persuasion that he fears persecution on account of a protected ground, then the petitioner is not entitled to asylum, regardless of how many alternative non-protected grounds the IJ might find motivating the government. In other words, an IJ commits a "mixed motive" *legal error* if he finds that a petitioner put forth sufficient evidence to show that the government is partially motivated to persecute the petitioner based on a protected ground, but nonetheless concludes that the petitioner is not entitled to asylum because the government is also motivated by legitimate grounds. The key facets of prototypical mixed motive legal error, then, are findings of both illegitimate and legitimate motives followed by a conclusion that the illegitimate motive is legally insufficient because of the existence of a legitimate motive. As I have shown, the IJ here committed no such error.

## II.

Because the IJ correctly applied the INA, the question becomes whether the IJ's conclusion was "manifestly contrary to law," and whether the evidence in the record "compels" the conclusion that Menghesha had a well-founded fear that his government would persecute him because of his political opinion. *See* 8 U.S.C.A. § 1252(b)(4) (West 2005); *Elias-Zacarias*, 502 U.S. at 483-84 (holding that a petitioner "must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution"). The IJ's determinations regarding Menghesha's refugee status are conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias-*

*Zacarias*, 502 U.S. at 481 (internal quotation marks omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966); *Gonahasa v. INS*, 181 F.3d 538, 541 (4th Cir. 1999).

Thus, our review is most narrow, exceedingly deferential, and "recognizes the respect we must accord both the BIA's expertise in immigration matters and its status as the Attorney General's designee in deportation decisions." *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992). We apply such broad deference in asylum cases because Congress mandates that we do. *See INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("Within broad limits the law entrusts the agency to make the basic asylum eligibility decision here in question.").

To grant the petition for review, Menghesha's evidence must compel us to find a causal relationship between the Ethiopian government's motive in this case and his political opinion. Because Menghesha's evidence fails this standard, I conclude that the IJ's decision was supported by reasonable, substantial evidence. In fact, this case is similar to *Elias-Zacarias*, where the Supreme Court outlined the proper understanding of what it means to be persecuted on account of political opinion.

In *Elias-Zacarias*, the Supreme Court considered an applicant who claimed he feared being kidnaped or killed by a Guatemalan guerrilla organization because he refused to join the organization. 502 U.S. at 483. The Court, however, found that Elias-Zacarias put forth no evidence that would "compel the conclusion" that he had a well-founded fear of persecution "*because of* [his] political opinion." *Id.* at 483. The Court realized that even if Elias-Zacarias showed that he would be taken and killed by the guerrillas because of his refusal to join their group, it was "quite plausible, indeed likely, that the taking would be engaged in by the guerrillas in order to augment their troops rather than show their displeasure; and the killing he feared might well be a killing in the course of resisting being taken." *Id.* at 483 n.2. In short, his evidence failed to compel the Court that he would be persecuted *because of his political beliefs*.

Menghesha presented no evidence whatsoever showing direct causation, and little correlating evidence tending to show that government authorities in Ethiopia wished to persecute him on account of his political belief. It is "quite plausible, indeed likely," then, that any action against Menghesha will take place in order to prosecute him because he deliberately impeded the government's criminal investigation and not because the government disagrees with any political opinion expressed by Menghesha via his actions. *Id.* Although he has put forth evidence that the government has investigated his conduct and flight from Ethiopia, that evidence does not show that the government's interest in him was based on his political opinions rather than his dereliction of duty.[3] "[T]he mere existence of a generalized 'political' motive [or context] underlying [the supposed persecutor's actions] is inadequate to establish (and, indeed, goes far to refute) the proposition that [an applicant] fears persecution *on account of* political opinion." *Id.* at 482 (emphasis in original).

I do not question that a reasonable finder of fact could infer that the government may have wished to persecute Menghesha at least in part on account of his political opinion. But Menghesha put forth no evidence *compelling* such a conclusion. And while Menghesha does not have to "provide direct proof of his persecutors' motives, . . . the statute makes motive critical, [so] he must provide *some* evidence of [motive], direct or circumstantial. And [because] he seeks to obtain

---

[3]This point is made more clear when reviewing Menghesha's actions while in Ethiopia. According to Menghesha's written statement, he first voiced his displeasure with the government's actions in September of 1999. It was then that he was warned not to criticize his employer or the government might "harm" him. (J.A. at 184.) A year and a half later, in April of 2001, he was again given verbal warnings. Later that month he warned the students at the university and had his duties "modified" while the government investigated the leak. (J.A. at 187.) At no time while he was under investigation did the government use coercive means to question or interrogate him or take any steps against him that might establish a reasonable fear of persecution. Moreover, it was not until July 8, 2001, that he fled the country because he learned of his "impending arrest." (J.A. at 188.) Thus, the fear causing him to flee did not arise upon the government learning that he sympathized with other political groups years beforehand. Instead, he did not leave until the day he learned he was to be arrested for warning the students of their impending arrest.

judicial reversal of the BIA's determination, he must show that the evidence he presented was so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution. That he has not done." *Id.* at 483-484.

### III.

Accordingly, because I believe no legal error occurred in this case and the IJ's determination was supported by substantial evidence, I respectfully dissent.